## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. **JOANNA HOUSE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **CIV-15-** 579-F |
| | ) | |
| 1. **SCIENTIFIC GAMES** | ) | |
| **INTERNATIONAL, INC.,** | ) | |
| | ) | **ATTORNEY LIEN CLAIMED** |
| **Defendant.** | ) | **JURY TRIAL DEMANDED** |

## COMPLAINT

**COMES NOW** the Plaintiff, Joanna House, and for her Complaint in the above-entitled action, alleges and states as follows:

## PARTIES

1.     Plaintiff, Joanna House, is an African-American adult female resident of Oklahoma County, Oklahoma.

2.     The Defendant is Scientific Games International, Inc., an entity doing business in Oklahoma County, OK.

## JURISDICTION AND VENUE

3.     This is a cause of action arising out of Plaintiff's former employment with Defendant and is based on violations of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981 in the form of race discrimination, harassment and retaliation.  Plaintiff also brings claims for gender discrimination, harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964.

1

4.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §1331.

5.      All of the actions complained of herein occurred in Oklahoma County, Oklahoma.  Defendant is doing business in such county and may be served in said county. Oklahoma County is located in the Western District of Oklahoma.  Wherefore, venue is proper in this Court under 28 U.S.C. § 1391(b).

6.      To the extent required, Plaintiff has exhausted her administrative remedies by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on or about October 22, 2014.  Plaintiff received her Dismissal and Notice of Rights letter from the EEOC dated March 3, 2015 (received by Plaintiff by mail thereafter), and has timely filed this action within ninety (90) days of receipt of the notice of right to sue.

## STATEMENT OF FACTS

7.      Plaintiff began working for Defendant on or about April 1, 2013 as an Assistant Operations Manager where she supervised approximately eight (8) employees.

8.      Defendant is a corporation based out of Atlanta, GA that contracts with the Oklahoma State Lottery Board to provide lottery operations and support for the Oklahoma State Lottery.  Defendant is responsible for the statewide gaming system, including but not limited to lottery terminals and communications statewide, warehousing, distribution, and field technical and sales staff.

9.      At hire, Plaintiff reported to Computer Operations Manager Raylene Hobbs (White female).  When Hobbs separated from her employment with Defendant, Plaintiff began reporting to General Manager of Operations Bryan Colbert (Black male).  Then, in or around January 2014, Hobbs was replaced by Chris Cox (White male).

10.      Throughout her employment, Plaintiff's job performance was at least satisfactory, if not excellent.

11.      From the outset of her employment, Plaintiff experienced disrespectful, insubordinate and harassing treatment from subordinate Operators Robert Wilson (White male) and Allen Olmstead (White male).  Specifically, Wilson and Olmstead refused to follow Plaintiff's directives and undermined Plaintiff's authority by being outwardly disrespectful to her.

12.      In or around September 2013, Plaintiff began attempting to issue written discipline to Wilson and Olmstead for repeatedly circumventing Plaintiff by going to Colbert with job-related issues and intentionally ignoring Plaintiff's instructions.

13.      For instance, at times, Plaintiff asked individual operators to stay late to finish projects.  On one occasion, Olmstead sent an operator home though Plaintiff had asked the operator to stay.  When Plaintiff confronted Olmstead about the issue, Olmstead said he did not feel the operator's presence was necessary and admittedly sent the operator home contrary to Plaintiff's directive.

14.      On another occasion, Plaintiff asked an employee to post the games numbers

and jackpots each day in the data center.  This information was required for the operators'
daily morning reports and posting such information saved each operator the time and effort
of locating the information in the future.  However, the employee told Plaintiff that Wilson
and Olmstead removed the information, even after the employee told them she was directed
to post such information by Plaintiff.  When confronted, Wilson stated that they were "not
dumb" and could look up the information for themselves.  However, other employees
thanked Plaintiff for posting such information because this posting saved them time and was
consistent with the practice of Defendants' other operations locations.

15.    On each occasion that Wilson or Olmstead defied Plaintiff's authority, Plaintiff
reported such conduct to Colbert and asked that she be allowed to discipline them.  Plaintiff
told Colbert that she was not sure if the employees had a problem with her because she is
Black and/or a woman, but that their conduct could not continue.

16.    Colbert disregarded Plaintiff's concerns, stating that the employees simply
needed to "get used" to Plaintiff.  And, Colbert told Plaintiff that she could not issue written
discipline to the employees at that time.

17.    On or about November 6, 2013, Plaintiff asked Olmstead to begin rolling dates
into a program.  Olmstead told Plaintiff he could not do so because he was working on
folders for the application.  Plaintiff told Olmstead that another employee had completed the
folders he was referring to and she wanted him to start working on rolling in dates.

18.    As Plaintiff left Olmstead's area, Olmstead called Plaintiff a "n****r" under

4

his breath.  Plaintiff turned and asked Olmstead what he said, and he responded "nothing."

19.     Plaintiff immediately reported Olmstead's use of the n-word to Colbert. Plaintiff also stated her concern that her gender or race might be a problem among her White male subordinates.  Colbert said nothing in response.  Plaintiff left Colbert's office and went back to work, but ultimately had to leave early that day due to Olmstead's use of the racial slur and Colbert's refusal to address the issue.

20.     On or about December 12, 2013, Plaintiff was again called a "n****r."  On this occasion, Plaintiff asked Wilson for an update on a testing project, and Wilson responded that he had no updates.  However, when Colbert asked Wilson about the same project, Wilson told Colbert about issues he was experiencing with testing.  Plaintiff then questioned Wilson about his inconsistent statement to Plaintiff.  Wilson gave Plaintiff no response.

21.     As Plaintiff walked out of the room, Wilson turned to Olmstead and called Plaintiff a "dumb n****r."  Plaintiff again reported this offensive racial slur to Colbert.  In response, Colbert told Plaintiff to hang in there and that Wilson and Olmstead would come around.

22.     Wilson and Olmstead continued to undermine Plaintiff and treat her disrespectfully.  Plaintiff repeatedly reported the conduct to Colbert and again asked whether Wilson and Olmstead had a problem with her being Black and/or a woman, but Colbert still would not allow Plaintiff to address her disciplinary concerns.

23.     In addition, on at least one occasion, Olmstead called Plaintiff a "bitch" after

Plaintiff gave him a directive.

24.     Therefore, on or about February 3, 2014, Plaintiff spoke with Regional Director of Operations Douglas Parker (White male) to address her workplace concerns.  Plaintiff gave Parker specific instances of disrespect and insubordination by Wilson and Olmstead. She told Parker that she had informed Colbert of her concerns, to no avail.  Plaintiff further told Parker that she had never been harassed or discriminated against with prior employers and the conduct needed to stop.

25.     Parker agreed that this behavior was unacceptable and stated he would investigate Plaintiff's concerns and take action as necessary.  However, Plaintiff was given no indication thereafter of what, if any, action was taken as a result of her complaints.

26.     Instead, on or about March 10, 2014, Colbert verbally counseled Plaintiff for allegedly engaging in "horseplay" with Assistant Marketing Manager John Hayes (White male).  Specifically, Hayes engaged in office pranks with Plaintiff and other employees by locking Plaintiff out of her office, *inter alia*.  In response, Plaintiff and Cox played a similar prank on Hayes.

27.     When Hayes discovered the prank, Hayes raised his voice and cursed at Plaintiff in front of other employees and a customer.  Plaintiff did not respond, and although Plaintiff's supervisor Cox was involved in the incident, Plaintiff was disciplined.

28.     Prior to this, Plaintiff had received no discipline.

29.     Plaintiff contacted Human Resources Manager Betsy Bridger to ascertain

whether the verbal counseling would become part of Plaintiff's personnel file.  Plaintiff also told Bridger about her earlier complaints concerning Olmstead and Wilson.  Bridger told Plaintiff that the verbal counseling would not be documented in Plaintiff's personnel file.

30.     In or around March 2014, Plaintiff was given the task of implementing a new electronic game for the Lottery Board.  Plaintiff was the only individual capable of implementing such project.  The project went live in or around mid-September 2014 and Plaintiff conducted the stabilization of the project for approximately two (2) weeks thereafter.

31.     Shortly after completing the stabilization of the new game, on or about September 30, 2014, Plaintiff was terminated.  Plaintiff was told by Colbert and Administrative Coordinator Melinda Vann that individuals other than Colbert and Vann decided to terminate Plaintiff for allegedly disclosing confidential information to an operator.  Specifically, Plaintiff was accused of telling an operator that Defendant's Oklahoma City operations were being moved to Atlanta, GA.

32.     Such reason was false and merely pretext.  Throughout Plaintiff's tenure, Oklahoma City employees had been generally aware of and discussed the possibility of operations moving to Atlanta, GA.  In fact, Hobbs previously discussed this possibility openly while she was still employed with Defendant.  Therefore, the fact that operations may move to Atlanta, GA was clearly not "confidential" information.

33.     And, the event in question occurred months before Plaintiff's termination.  In

or around March 2014, an operator approached Plaintiff and asked whether operations were being moved to Atlanta, GA.  Plaintiff did not tell the operator that operations were definitely moving to Atlanta, GA.  Rather, Plaintiff stated there were rumors of such a move, and that the operator should obtain all of the training she could in the event it did happen.

34.     Moreover, Defendant did not conduct an investigation into the allegation that Plaintiff allegedly disclosed confidential information.  Plaintiff was not interviewed about the issue before her termination.

35.     And, following her termination, Plaintiff contacted Bridger to lodge a complaint about her termination.  Plaintiff was directed to contact Vice President of Human Resources Gary Melampy (Male) or Director of Investigations/Compliance Rick Maxwell (Male) to discuss her concerns, which she did. Ultimately, Melampy changed the reason for termination by stating that Plaintiff was terminated not for disclosing confidential information to an operator, but to a third party.  Plaintiff asked to whom she supposedly made this disclosure and how Melampy discovered this, but Melampy said he did not have to provide Plaintiff with this information.

36.     As a direct and proximate result of Defendant's actions, Plaintiff has suffered the injuries described hereafter.

## COUNT I - Title VII Race and Retaliation

For her first cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

37.    The matters alleged above constitute violations of Title VII of the Civil Rights Act of 1964 in the nature of race discrimination, the creation of a racially hostile work environment, and retaliation for her complaints of the same.

38.    Plaintiff is entitled to relief under Title VII because she is Black, was qualified for her job, was terminated, and her position was not eliminated after her termination.

39.    Plaintiff is further entitled to relief under Title VII because she engaged in a protected activity by lodging internal complaints of race discrimination, she suffered an adverse action, and, as shown above, there is a causal link between the protected activity and the adverse action.

40.    As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

41.    Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## COUNT II - 42 U.S.C. § 1981 Violations

For her second cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

42.    The matters alleged above constitute violations of 42 U.S.C. § 1981 in the nature of race discrimination, the creation of a racially hostile work environment and

retaliation.

43.    As damages, Plaintiff has suffered lost earnings, past and future, emotional distress and other equitable and non-pecuniary losses.

44.    Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## COUNT III - Title VII Gender and Retaliation

For her third cause of action, Plaintiff incorporates all prior allegations and further alleges and states as follows:

45.    The matters alleged above constitute violations of Title VII of the Civil Rights Act of 1964 in the nature of gender discrimination, the creation of a hostile work environment, and retaliation for her complaints of the same.

46.    Plaintiff is entitled to relief under Title VII because she is a woman, was qualified for her job, was terminated, and her position was not eliminated after her termination.

47.    Plaintiff is further entitled to relief under Title VII because she engaged in a protected activity by lodging internal complaints of gender discrimination and a hostile work environment, she suffered an adverse action, and, as shown above, there is a causal link between the protected activity and the adverse action.

48.    As damages, Plaintiff has suffered lost earnings, past and future, emotional

distress and other equitable and compensatory damages allowed by the Civil Rights Act of 1991.

49.     Because the actions of the Defendant were willful, wanton or, at the least, in reckless disregard of Plaintiff's rights, Plaintiff is entitled to punitive damages as provided by the Civil Rights Act of 1991.

## REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff prays that this Court enter judgment in favor of the Plaintiff and against the Defendant and assess actual, compensatory, punitive damages, together with pre- and post-judgment interest, costs, attorney's fees and such other relief as this Court may deem equitable and appropriate.

**RESPECTFULLY SUBMITTED THIS 27th DAY OF MAY, 2015.**

s/Jana B. Leonard
JANA B. LEONARD, OBA# 17844
LAUREN W. JOHNSTON, OBA # 31744
LEONARD & ASSOCIATES, P.L.L.C.
8265 S. WALKER
OKLAHOMA CITY, OK 73139
(405) 239-3800       (telephone)
(405) 239-3801       (facsimile)
leonardjb@leonardlaw.net
johnstonlw@leonardlaw.net

JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED

11